UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE DORAL FINANCIAL CORPORATION SECURITIES LITIGATION | X ) ) ) 05- MD - 1706(RO) ) ) |
| This Document Relates to: | ) ) |
| Gavov v. Levis, 05-cv-5248; Freeborn v. Levis, 05-cv-5250; Rosenbaum Capital, LLC v. Levis, 05-cv-5486; Corwin v. Levis, 06-cv-7711; and Fox v. Levis, 07-cv-3252. | ) ) ) ) ) ) X |

**PLAINTIFF ROBERT FOX'S OBJECTION TO DERIVATIVE SETTLEMENT**

**AND INTENT TO APPEAR AT FAIRNESS HEARING**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................... 1

STATEMENT OF FACTS ...................................................................................................... 5

    A.    The Litigation.............................................................................................. 5

    B.    The Derivative Settlement ................................................................... 7

ARGUMENT ............................................................................................................................ 10

    A.    The Derivative Settlement is Not Fair, Reasonable or Adequate ......................... 10

        1.    The Derivative Settlement Is Unfair to Doral Because It Releases
            Claims Without Obtaining Any Monetary or Meaningful Recovery ....... 11

        2.    The Benefits to Doral of the Corporate Enhancements are Illusory
            and Unrelated to the Abuses Committed by the Derivative Defendants .. 16

    B.    The Settlement Negotiations Were Not Extensive or Well Informed .................. 18

    C.    Lead Derivative Counsel is Not Entitled to Attorney's Fees
        Because the Benefits to Doral From the Settlement Are Insubstantial................ 20

CONCLUSION......................................................................................................................... 22

# <u>TABLE OF AUTHORITIES</u>

## CASES

*In re AFC Enters., Inc.*,
224 F.R.D. 515 (N.D. Ga. 2004)................................................................................11

*In re AOL Time Warner Shareholder Derivative Litig.*,
2006 WL 2572114 (S.D.N.Y. Sept. 6, 2006)............................................................18

*Blatt v. Dean Witter Reynolds Intercapital, Inc.*,
732 F.2d 304 (2d Cir. 1984).....................................................................................11

*In re Cenco Sec. Litig.*,
642 F. Supp. 539 (N.D. Ill. 1986), *on remand from Cenco Inc. v. Seidman &*
*Seidman,* 686 F.2d 449, 457-58 (7th Cir. 1982) .........................................................15

*In re Cendant Corp. Sec. Litig.*,
109 F. Supp. 2d 235 (D.N.J. 2000), *aff'd* 264 F.3d 201 (3d Cir. 2001) ......................14

*In re Cendant Corp. Sec. Litig.*,
166 F. Supp. 2d 1 (D.N.J. 2001) .........................................................................13, 15

*In re Cendant Corp. Sec. Litig.*,
139 F. Supp. 2d 585 (D.N.J. 2001) ...........................................................................13

*City of Detroit v. Grinnell Corp.*,
495 F.2d 448 (2d Cir.1974)......................................................................................10

*D'Amato v. Deutsche Bank*,
236 F.3d 78 (2d Cir.2001).................................................................................10, 18

*Kaplan v. Rand*,
192 F.3d 60 (2d Cir. 1999).................................................................................20, 21

*Lewis v. Hirsch*,
1994 WL 263551 (Del. Ch. 1994) ......................................................................19, 20

*Mathes v. Roberts*,
85 F.R.D. 710 (S.D.N.Y.1980) ................................................................................10

*In re Metro. Life Derivative Litig.*,
935 F. Supp. 286 (S.D.N.Y.1996).............................................................................10

*NCP Litig. Trust v. KPMG LLP*,
901 A.2d 871 (S. Ct. N.J. 2006)...............................................................................12

*In re Texaco, Inc. S'holder Litig.,*
    20 F. Supp. 2d 577 (S.D.N.Y. 1998) , *rev'd sub. nom. on other grounds* ....................16

*Zucker v. Westinghouse Elec. Corp.,*
    265 F.3d 171 (3rd Cir. 2001) ....................................................................................13

**STATUTES**

15 U.S.C. § 78u-4(f)(7)(A) ..............................................................................................13

Dr. Robert Fox, through his attorneys Zwerling, Schachter & Zwerling, LLP and Bernstein Litowitz Berger & Grossmann LLP respectfully submits this objection to the proposed settlement of the consolidated derivative action (the "Derivative Settlement") and to the application for an award of attorneys' fees to Lead Derivative Counsel, the law firm of Federman & Sherwood.  Dr. Fox, as set forth in the derivative complaint he filed in *Fox v. Levis, et al.*, Civ No. K AC 06-4814, in the Commonwealth of Puerto Rico, Court of First Instance, Superior Court of San Juan, was a shareholder of Doral Financial Corporation ("Doral" or the "Company") during the period of the alleged wrongdoing and remains a significant shareholder of the Company.  As set forth herein, the proposed Derivative Settlement fails to meet the requirements of Rule 23.1 of the Federal Rules of Civil Procedure and should not be approved, because, among other reasons, it (i) provides no monetary or otherwise tangible recovery for Doral (the nominal plaintiff) from any of the wrongdoers; (ii) requires Doral – not the wrongdoer defendants –to pay Lead Derivative Counsel $1,000,000 in attorneys' fees despite Lead Derivative Counsel's failure to obtain any meaningful consideration and advance its case beyond the filing of an initial complaint; and (iii) attempts, for no consideration, to forever bar claims against PricewaterhouseCoopers LLP ("PwC"), Doral's external auditing firm, which were asserted in Dr. Fox's action.

## PRELIMINARY STATEMENT

On or about May 1, 2007**,** defendants and Lead Class and Derivative Counsel in this Action filed with this Court a Stipulation and Agreement of Partial Settlement ("Stipulation"), which, if approved by the Court, will partially settle the class action litigation pending against Doral and several of its former officers (the "Class Action"), and fully settle the derivative actions pending against several of Doral's former officers and directors (the "Derivative

Actions").[1]  In addition to settling the Derivative claims for no monetary consideration, the bar order provisions in the proposed judgment to be entered could potentially prevent or restrict Dr. Fox from prosecuting derivative claims he has asserted against PwC for its role in the massive fraud at Doral.  Indeed, PwC, as the Company's external auditor, issued materially false and misleading unqualified auditor's reports for each of the five annual financial statements Doral was required to restate.  As a result, the terms of the Derivative Settlement are not fair, reasonable or adequate and should not be approved.

The principal bases for Dr. Fox's objection to the Derivative Settlement are as follows:

- Doral will pay $128,000,000 to the Class, and the Individual Defendants will pay $1,000,000 to the Class, but Doral will not recover a single penny from the Individual Defendants or their insurers.  The Individual Defendants' liability for the massive fraud at the Company cannot seriously be disputed, nor has there been any demonstration that these persons, who appear to have sufficient wealth, achieved in part as a result of substantial insider trading, cannot meaningfully contribute to the Derivative Settlement.  Indeed, there is no representation in the settlement papers that Lead Derivative Counsel obtained from these defendants net worth statements or any other documentation of their inability to make a substantial contribution to the Derivative Settlement.

- PwC is expressly excluded from the Derivative Settlement (as well as from the Class Settlement).  While the Class's securities fraud claims are unaffected by the terms of the Settlements, the proposed bar order in the Class Action may be interpreted to bar claims Dr. Fox has already asserted against PwC in the derivative action he commenced in Puerto Rico.[2]

---

[1]    Dr. Fox is also a class member in the Class Action, which has also been preliminarily settled for $129 million, and is also being presented to this Court for final approval (the "Class Settlement"; together with the Derivative Settlement, the "Settlements").  Dr. Fox has no objections to the terms of the Class Settlement, other than with respect to the bar order discussed below.  Although Dr. Fox's action was transferred to this Court after it was removed from the Commonwealth of Puerto Rico, Court of First Instance, it has never been consolidated with this Derivative Action.  Nevertheless, and without consulting with Dr. Fox, Lead Derivative Plaintiff and defendants purport to include Dr. Fox's action in the Derivative Settlement.  *See* Stipulation at ¶1(m) (defining "Derivative Actions" to include *Fox v. Levis*, 07-3252).  Dr. Fox has filed a motion to remand his case back to Commonwealth of Puerto Rico, Court of First Instance.  That motion is fully briefed and remains pending.

[2]    The proposed bar order expressly bars claims for contribution asserted by a settling defendant, which term expressly includes Doral, against PwC.  Although, as described below and in his remand papers, Dr. Fox believes that those breach of contract, negligence, misrepresentation and aiding and abetting breach of fiduciary duty claims he has asserted against PwC are not claims for contribution, all defendants, including PwC, have argued in connection with the motion for remand of Dr. Fox's derivative action, that those claims do sound in contribution.

● The corporate governance improvements Doral agreed to adopt are unrelated to the wrongdoing at the Company. Particularly, they fail to address the fact that the Audit Committee still includes two persons who were members of that Committee throughout the period of wrongdoing and the fact that PwC remains Doral's auditor even though it issued five consecutive "clean" auditor's reports on financial statements that have to be materially restated.[3]

The utter inadequacy of the Derivative Settlement is not surprising given the manner in which Lead Derivative Counsel "prosecuted" the case. In the twenty-six months since the first derivative action was filed, Lead Derivative Counsel has failed to file an amended complaint or conduct any discovery. Lead Derivative Counsel's only action here, for which he seeks a $1,000,000 fee, occurred when he voluntarily agreed on June 21, 2006 to stay the case (which stay remains in effect). Lead Derivative Counsel apparently made no attempt to develop the facts, to determine the strength or weakness of the various claims and defenses, to recover any of the millions of dollars of ill-gotten bonuses, stock-option grants, or fees that Doral paid to the derivative defendants, or to negotiate a fair settlement (See Cmplt. ¶¶ 5-16, 69, 71-72 (describing allegations against the Individual Defendants)).[4] Instead, Lead Derivative Counsel preferred to ride the coattails of Lead Class Counsel, which, in addition to claiming responsibility for the very same corporate governance enhancements Lead Derivative Counsel claims he obtained, obtained $129,000,000 for the Class, including $1,000,000 from the Individual Defendants and $34,000,000 from Doral's insurers. Indeed, Lead Derivative Counsel never even brought any claims against PwC, which only was named as a party much later in another derivative action that was then consolidated with the lead derivative action.

---

[3]    These illusory "improvements" were not obtained by Lead Derivative Counsel alone. Lead Class Counsel has also claimed responsibility for them. (*See* Stipulation at ¶ 9.)

[4]    Citations to Dr. Fox's complaint appear as "(Cmplt. ¶ __)." A copy of that complaint, together with all briefing on Dr. Fox's motion to remand, was provided to the Court by letter dated April 26, 2007.

This is not the first derivative settlement for which Lead Derivative Counsel has sought judicial approval even though the settlement provided no recovery for the company he purportedly represented.  In *In re Brocade Communications Systems, Inc. Derivative Litigation*, in circumstances remarkably similar to those present here, Lead Derivative Counsel recently agreed to dismiss the company's auditor without obtaining any recovery from it, obtained no monetary recovery from the "settling defendants," and based the derivative settlement on corporate governance reforms that could be eliminated by the company after the settlement.  *See* No. C 05-223 CRB (N.D. Cal.), Transcript of April 27, 2007 Fairness Hearing, at 6-11 (attached hereto as Exhibit 1).  That settlement, for which Lead Derivative Counsel sought a fee of $525,000, was objected to by the state court derivative plaintiffs, and even the federal plaintiffs sought a postponement of the fairness determination until more facts concerning the merits of the claims could be developed.  Judge Breyer, noting, among other things, that the governance enhancements were totally illusory, declined to approve the settlement, deciding that more time was needed to address the serious concerns that had been raised.  *Id.*

Lead Derivative Counsel's lack of prosecution is made even more obvious when the derivative complaint filed here is compared to facts asserted in the complaint Dr. Fox filed in Puerto Rico after waiting for Lead Derivative Counsel to undertake some form of prosecution effort.  It is no surprise that defendants have tried so hard through procedural gambits to eliminate Dr. Fox's claims, and that they preferred to reach a settlement with Lead Derivative Counsel rather than face Dr. Fox who, as a citizen of Puerto Rico, has demonstrated his diligence in pursuing the rights of the victims of the banking scandal in the Commonwealth by serving as the lead plaintiff in the *First BanCorp* case, in which he recently achieved a proposed settlement

for $74,250,000, and sought to be lead plaintiff in this action but withdrew when institutional investors with larger financial positions came forward to serve.

In sum, this Court should not approve the Derivative Settlement in its present form because it is not fair, reasonable or adequate. The Court should (i) require a sufficient showing that the Individual Defendants are not financially capable of meaningfully contributing to the Derivative Settlement; (ii) require Doral to adopt reasonable corporate governance enhancements that are directed at the failures that led to the fraud; and (iii) modify the bar order provision of the proposed judgment so that Dr. Fox's claims against PwC are not barred; and (iv) remand Dr. Fox's action back to the Commonwealth of Puerto Rico, Court of First Instance. Nor should Lead Derivative Counsel be awarded any attorney's fees without first demonstrating the benefits Lead Derivative Counsel actually provided. Under the circumstances, the Court should permit Dr. Fox to undertake limited discovery focused on the manner in which Lead Derivative Counsel conducted settlement negotiations and the bases for agreeing to the terms of the Derivative Settlement.

## STATEMENT OF FACTS

### A.    <u>The Litigation</u>

On June 10, 2005, Rosenbaum Capital, LLC filed in this Court a derivative action on behalf of Doral against several former officers and directors of the Company. This action asserted various violations of federal and common law. It, along with several other derivative actions also filed on behalf of Doral, were consolidated and transferred to this Court by Order of the Judicial Panel on Multidistrict Litigation on October 31, 2005. On April 27, 2006, the Court appointed Rosenbaum Capital, LLC as Lead Derivative Plaintiff, and its counsel, William Federman of Federman & Sherwood, as Lead Derivative Counsel. On June 21, 2006, Lead Derivative Counsel entered into a Stipulation with the derivative defendants that stayed the

consolidated derivative actions pending the resolution of the motions to dismiss filed in the securities class action pending against Doral. Since agreeing to that stay, Lead Derivative Counsel apparently has done nothing to prosecute the derivative claims.

Dr. Fox, who currently owns 81,000 shares of Doral common stock and resides in San Juan, Puerto Rico, became greatly concerned by Doral's worsening financial condition and the inaction by Lead Derivative Counsel. On August 15, 2006, after waiting fourteen months from the filing of the first derivative complaint, he stepped forward to assert claims in a derivative complaint (the "Complaint") filed on behalf of the Company, against certain of its current former officers and directors and PwC, in the Commonwealth of Puerto Rico Court of First Instance. The Complaint sought to remedy those defendants' violations of Puerto Rico's corporate law, including their breaches of fiduciary duties, duties of loyalty, abuse of control, gross mismanagement, waste of corporate assets, unjust enrichment and professional negligence that occurred between January 2000 and February 27, 2006 (the "Relevant Period") (Cmplt. ¶ 1).

During the Relevant Period, the Officer Defendants were responsible for the accounting irregularities, misconduct and lack of internal controls at Doral. The Officer Defendants were active participants in the fraudulent conduct at Doral (Cmplt. ¶¶ 43, 44, 45, 46, 47), disseminated false and misleading information to the public during the Relevant Period concerning Doral's true financial condition (Cmplt. ¶¶ 30, 32), and engaged in this conduct to enrich themselves at the expense of the Company (Cmplt. ¶¶ 5, 6, 7, 8, 9, 10, 31, 59). Several of the Individual Defendants sold Doral stock during the Relevant Period and collectively reaped $19.2 million (Cmplt. ¶ 59). PwC, as the Company's outside auditor, approved of, and aided and abetted, the accounting irregularities and wrongdoing alleged in the Complaint (Cmplt. ¶¶ 27, 28).

The impact of the defendants' misconduct and the restatement has been devastating to Doral. Doral's market capitalization declined by $ 4 billion during the Relevant Period (Cmplt. ¶ 59), its Series C preferred stock was delisted from the NASDAQ stock market (Cmplt. ¶ 39), its credit ratings were downgraded by the three major credit rating agencies (Cmplt. ¶ 39), numerous securities class actions were filed (Cmplt. ¶ 51), and Doral is now under increased supervision by federal banking regulators (Cmplt. ¶ 40). Moreover, Doral's financial condition has worsened since the end of the Relevant Period, and its market capitalization has declined by more than 80% in the past year. Today, Doral is on the brink of insolvency, which was caused by the misconduct of the derivative defendants.[5]

## B.    The Derivative Settlement

According to the terms of the Stipulation, the Individual Defendants are released from the Derivative Actions without paying any consideration, *see* Stipulation ¶ 10, and the bar order provisions of the proposed judgment (Ex. E to the Stipulation at ¶ 12) may be argued by PwC, as it has argued previously in connection with Dr. Fox's motion to remand, to bar the negligence, breach of contract and breach of fiduciary duty claims Dr. Fox has asserted against it. As a result, the parties responsible for the damage caused to the Company get off "scott free" and are allowed to keep the millions of dollars they obtained as a result of their misconduct. Instead, the Derivative Settlement requires that Doral pay $1,000,000 in attorney's fees and expenses to Lead Derivative Counsel.

---

[5]    Doral had received two offers to purchase equity of the Company, both of which would be highly dilutive to current shareholders. On May 17, 2007, Doral announced that it had entered into a definitive stock purchase agreement, with Bear Stearns Merchant Banking ("BSMB") and other investors, for the sale of approximately 90% Company for $610 million, or $0.63 per common share. On June 4, 2007, Doral announced that it received an unsolicited offer from FBOP Corporation, a privately-held bank holding company, to purchase from Doral $610 million of common stock at approximately $1.41 per share, for an 80% ownership interest in Doral. Doral announced on June 25, 2007 that FBOP had withdrawn its offer.

The Stipulation also requires Doral to adopt the corporate governance "enhancements," detailed in Schedule 1 to the Stipulation. Those so-called enhancements relate to six principal areas: Independent Directors, Related Party Transactions, Board Leadership, Executive Compensation, Shareholder Proposals, and Poison Pill provisions. Significantly, none of the corporate enhancements relate to the weaknesses at Doral that lead to the Company's restatement and the improper conduct alleged in the Complaint, namely, the lack of internal controls and financial reporting, weak audit committee oversight, a poorly trained and understaffed accounting department, and the domination of the Company by the former Chief Executive Officer and his family. Meaningful reforms in any of these areas would greatly benefit the Company and its shareholders, but the terms of the Derivative Settlement do not provide for any such reforms. Indeed, given that two members of the current Audit Committee were, at best, asleep at the switch throughout the period the Company was being pillaged (Cmplt. ¶ 71), and given that PwC remains the Doral's auditor despite its utter failure in that regard (Cmplt. ¶¶18-28, 49), any meaningful enhancements should have included at least the following provisions:

- The Audit Committee shall (a) be comprised of at least three Independent Directors, excluding any Director who was a member of the Audit Committee at any time between January 2000 through December 31, 2003.

- The Audit Committee shall recommend that Doral's shareholders vote to replace Doral's external auditing firm for the fiscal year beginning January 1, 2008 unless the Audit Committee determines, based upon its consideration of, among other factors, the past and present performance of Doral's current external auditing firm and the availability of other qualified external auditing firms, that not replacing Doral's current external auditing firm is in the Company's best interests. This determination (i) shall be documented, setting forth the reasons therefore; and (ii) shall be repeated and documented each year for the next five years or until Doral's current external auditing firm is replaced.

- The Audit Committee shall retain as a consultant to the Committee an expert in accounting and auditing who shall attend each meeting that the Audit Committee conducts with Doral's external auditing firm for the next three years in order to provide the Audit Committee advice and counsel concerning any matters raised at such meetings, including, but not limited to, the implementation of new accounting or auditing pronouncements, the independence of Doral's external

auditing firm, and disagreements between Doral's external auditing firm and Doral management.

Unlike the "enhancements" proposed by Lead Derivative Counsel as the sole basis for the Derivative Settlement, these provisions directly address the issues relevant to Doral's internal control weaknesses.

In addition, the corporate enhancements that are part of the proposed Derivative Settlement, modest as they are, may be eliminated shortly after the consummation of a Refinancing Transaction. Doral now has received an offer to purchase a 90% equity stake in the Company. With the closing of that offer, Doral's Board and a majority of Doral's shares will be controlled by one entity and, under the terms of the Settlements, that entity will be free to modify these corporate enhancements at will.[6]

Finally, it is entirely unclear whether Lead Derivative Counsel may even claim that he negotiated the therapeutic benefits that are part of the Settlements. The Stipulation states that it was the Lead Plaintiff, in consideration for the full and complete settlement of the Class Action and the Released Claims, that negotiated the corporate governance measures detailed in Schedule 1. *See* Stipulation ¶ 9(i). That paragraph raises the issue of whether Lead Derivative Counsel accomplished anything at all on behalf of Doral. Given Lead Derivative Counsel's apparent lack of interest or activity in this Action, and his history of settling derivative actions without recovering any valuable consideration, any doubt concerning who should be credited with negotiating the corporate enhancements should be resolved in favor of the Lead Plaintiff.

---

[6]    The Corporate Governance Term Sheet, attached as Schedule 1 to the Stipulation, provides that Doral may alter or remove any of the provisions if "such alteration or amendment is first approved by Doral's shareholders by a majority of votes cast at a shareholder's meeting at which a quorum is present," or if the Board "determines that it is in the best interest of its shareholders to adopt the alteration or amendment without the delay and expense in adoption that would result from seeking shareholder approval." Alterations without shareholder approval, however, would expire if not ratified by shareholder vote within twelve months of adoption (Schedule 1, page 1, (4)(i) & (ii)). These corporate enhancements, then, are completely illusory and of no real benefit to Doral or its current shareholders.

## ARGUMENT

**A.**    **The Derivative Settlement is Not Fair, Reasonable or Adequate**

Rule 23.1 of the Federal Rules of Civil Procedure provides that a shareholder derivative action "shall not be dismissed or compromised without the approval of the court." A derivative action settlement must be "fair to all and . . . not favor the named plaintiff-shareholders or their counsel," *Blatt v. Dean Witter Reynolds Intercapital, Inc.*, 732 F.2d 304, 307 n.1 (2d Cir. 1984), and a Court should not engage in mere "rubber stamp approval" of a settlement. *See City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 462 (2d Cir.1974).

Indeed, before approving the settlement of a derivative action, the Court must be satisfied that the compromise "'fairly and adequately serves the interests of the corporation on whose behalf the derivative action was instituted.'" *Mathes v. Roberts,* 85 F.R.D. 710, 713 (S.D.N.Y.1980) (quoting *Republic Nat'l Life Ins. Co. v. Beasley,* 73 F.R.D. 658, 667 (S.D.N.Y.1977)). In applying this standard, courts commonly inquire into "whether the compromise is fair, reasonable and adequate," *In re Metropolitan Life Derivative Litig.,* 935 F. Supp. 286, 291 (S.D.N.Y.1996) (quoting *Weinberger v. Kendrick,* 698 F.2d 61, 73 (2d Cir.1982), *cert. denied,* 464 U.S. 818 (1983)), with respect to both "the negotiating process leading up to settlement as well as the settlement's substantive terms." *D'Amato v. Deutsche Bank,* 236 F.3d 78, 85 (2d Cir.2001).

In the context of shareholder derivative litigation, the following factors enunciated in *City of Detroit v. Grinnell,* 495 F.2d at 463, inform the Court's evaluation of whether a settlement is fair, reasonable, and adequate: (1) the reasonableness of the benefits achieved by the settlement in light of the potential recovery at trial; (2) the likelihood of success in light of the risks posed by continued litigation; (3) the likely duration and cost of continued litigation; and (4) any shareholder objections to the proposed settlement. *Id.*

The Court should not approve the Derivative Settlement because, as described below, it provides no real benefit to the Company, and thus, is unfair to Doral.

### 1. The Derivative Settlement Is Unfair to Doral Because It Releases Claims Without Obtaining Any Monetary or Meaningful Recovery

Most significantly, the Derivative Settlement releases the Individual Defendants from the litigation and may bar claims against PwC without any consideration for Doral (Stipulation ¶ 10; Ex E ¶ 12). As the Complaint makes clear, these derivative defendants were most responsible for the wrongdoing at Doral, and also reaped substantial, ill-gotten gains as a result of their own wrongdoing. Specifically, the Complaint alleges that certain Individual Defendants sold more than $19.2 million worth of Doral stock during the Relevant Period (Cmplt. ¶ 59), and members of the Levis family alone received from Doral more than $31.6 million in cash and bonuses, and options to purchase approximately 2.4 million shares of Doral common stock (Cmplt. ¶¶ 5, 7, 8, 9) during the Relevant Period.

Because the Individual Defendants' bonuses and stock-option grants were based largely on Doral's reported profitability (Cmplt. ¶ 31), and that profitability was the result of the derivative defendants' fraudulent scheme (Cmplt. ¶ 32), those bonuses and stock-options rightfully belong to Doral and should have been recovered in this Action. *See In re AFC Enterprises, Inc.,* 224 F.R.D. 515, 520 (N.D. Ga. 2004) (Court held that imposition of constructive trust was warranted when individual defendants engaged in insider sales in breach of their fiduciary duties, stating that "where a fiduciary in violation of his duty to the beneficiary receives or retains a bonus or commission or other profit, he holds what he receives upon a constructive trust for the beneficiary."). Because the Individual Defendants are not contributing anything to the Derivative Settlement (although they are contributing a modest $1,000,000 to the Class Settlement), and Lead Derivative Counsel has apparently done nothing to recover anything

from them, the Derivative Settlement should not be approved by this Court unless Doral's shareholders and the Court are satisfied that those defendants cannot meaningfully contribute to the Derivative Settlement. In that regard, Dr. Fox should be permitted to conduct limited discovery focused on the manner in which the Derivative Settlement was reached.

Approval of the Derivative Settlement also must be denied because, although PwC has contributed nothing to the Derivative Settlement, the terms of the proposed judgment may eliminate or substantially restrict any claims against it. PwC greatly benefited from, and aided and abetted, the fraud at Doral. PwC was not only Doral's auditor, but was also the auditor for First BanCorp and R&G Financial Corp. ("R&G"), two other Puerto Rico banks that were counterparties and participants in Doral's fraudulent accounting scheme (Cmplt. ¶ 28). PwC stood squarely at the locus of this fraud and deceit, and approved the improprieties and accounting irregularities related to the transactions among the three banks discussed in the Complaint. In exchange, PwC reaped more than $12,000,000 in fees from these three banks during the years 2000-2004. *Id.* If Dr. Fox successfully prosecutes the claims he asserted against PwC, PwC would be liable to Doral. *See NCP Litigation Trust v. KPMG LLP,* 901 A.2d 871, 887 (S. Ct. N.J. 2006) (Court upheld suit filed by a public company's successor-in-interest against its former auditor, reasoning that "[a]n auditor's professional duty to its corporate client requires the auditor to comply with GAAS and GAAP, which are designed, at least in part, to detect fraudulent activity.").

Nevertheless, the terms of the proposed bar order may eliminate or substantially curtail any chance of Doral recovering anything from PwC for its wrongful conduct. Specifically, paragraph 12 of the proposed judgment provides as follows:

> The Settling Defendants [which include Doral] are hereby permanently
> barred, enjoined, and restrained from commencing, prosecuting, or asserting

against the Non-Settling Defendant [PwC] ... any Claim for indemnity or contribution *(or any other Claim where the injuries to the Settling Defendants are actual or threatened Claims by or liabilities to the Plaintiffs,* or any settlement which the Settling Defendants are obligated to pay or agree to pay to a Plaintiff) based upon the Released Claims, whether as claims, cross-claims, counterclaims, third-party claims or otherwise, whether or not asserted in the Complaint, and whether asserted in this Court, in any federal or state court, or in any other court, arbitration proceeding, administrative agency, or other tribunal or forum in the United States or elsewhere.

Exhibit E to the Stipulation at ¶ 12 (emphasis added). This proposed provision, in particular the highlighted text, exceeds the bar order prescribed by the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), which requires only that such an order "shall bar all future claims for contribution arising out of the action." 15 U.S.C. § 78u-4(f)(7)(A). The extraneous and objectionable language in paragraph 12 of the proposed judgment is entirely unjustified, and appears to have been specifically designed to bar Doral's ability to recover against PwC without receiving even a penny of consideration from PwC. In stark contrast to this bar of Doral's claims, the Class's claims against PwC are expressly saved. There is no explanation for Lead Derivative Plaintiff's and Lead Derivative Counsel's agreement to permit the entry of such a broad and impermissible provision, which could bar or severely restrict Doral's ability to recover from PwC on the independent claims Dr. Fox asserted under Puerto Rico law that, but for the offensive language, would remain viable. See *In re Cendant Corp. Sec. Litig.*, 166 F. Supp. 2d 1, 5 (D.N.J. 2001) ("The plain language of the statute speaks of a bar against all future claims for contribution which arise out of the action. It says nothing about a bar of related state law claims, as it could have, had Congress meant to bar state law claims in addition to federal securities contribution claims.").

    *In re Cendant Corporation Securities Litigation*, 139 F. Supp. 2d 585 (D.N.J. 2001), is particularly instructive in explaining that the claims Dr. Fox has asserted are independent and not barred by the required PSLRA bar. In that case, the class reached a settlement with Cendant

Corporation ("Cendant") for over $2.8 billion, and a separate settlement with Ernst & Young LLP ("E&Y"), Cendant's former external auditor, for $335 million. *See In re Cendant Corp. Sec. Litig.*, 109 F. Supp. 2d 235 (D.N.J. 2000) (approving settlement agreements between consolidated class and Cendant and E&Y), *aff'd* 264 F.3d 201 (3d Cir. 2001). When it approved those settlements, the district court entered the required PSLRA bar order. *See* 139 F. Supp. 2d at 589. Notwithstanding the bar order, Cendant asserted against E&Y claims, among others, under state law theories of common law fraud, negligence, and breach of contract, seeking to recover damages that included millions of dollars in audit fees, legal fees and other expenses incurred in defense of investor and other lawsuits as well as criminal and SEC investigations, and over $3 billion that Cendant paid to settle various lawsuits. *Id.* at 588. E&Y moved to dismiss all of Cendant's claims, arguing that they were contribution claims barred by the PSLRA-required bar provisions, and that all such claims were "nothing more than a thinly-veiled attempt to obtain indemnity from E&Y, which is also barred by the PSLRA." *Id.* E&Y claimed that Cendant's state law claims should be barred because they were "integrally related" to the settled federal securities law claims; in particular, E&Y "[r]equest[ed] application of the PSRLA to 'claims for indemnification of the amount paid in settlement,' because the purpose to encourage settlement would be inhibited if defendants were allowed to seek indemnity from public accounting firms." *Id.* at 593-96. The court disagreed.

Even though the damages Cendant sought from E&Y included the amount Cendant paid to settle the claims the class asserted against it, the Court "reject[ed] E&Y's argument that all state law claims that are integrally related to a federal securities claim are barred as improper indemnity claims." *See id.* at 594. The Cendant court, relying on several cases, reasoned that

> "merely because Cendant's tort and contract claims seek to recover damages that
> could be recoverable in a state law indemnity action do not convert these claims

into impermissible indemnity claims under the federal securities laws. Rather, they are independent, non-indemnity claims that are neither barred nor preempted by the federal securities laws.

*See id.* at 594-96 (relying on and quoting *In re Cenco Securities Litig.*, 642 F. Supp. 539, 541-42

(N.D. Ill. 1986) ("The gist of Seidman's fraud claim is not that it is more equitable that Cenco

pay for Seidman's loss to the class, but that Cenco has committed a tort to Seidman, and must

pay damages for this, damages which happen to encompass the settlement payment. That this

element of damages overlaps what Seidman maybe could have recovered through indemnity

does not make it indemnity."), *on remand from Cenco Inc. v. Seidman & Seidman,* 686 F.2d 449,

457-58 (7th Cir. 1982) (allowing state law claims to proceed, because they were premised on

independent duties Cenco owed to the plaintiff and were not impermissible indemnification

claims in disguise)).

E&Y next moved to have Cendant's prayer for damages stricken to the extent Cendant

sought to recover any portion of the $2.8 billion settlement Cendant paid to the class. *In re*

*Cendant Corp. Sec. Litig.*, 166 F. Supp. 2d 1, 2-3 (D.N.J. 2001). E&Y argued that, because

Cendant was seeking to recover its settlement payment, that element of damages transformed

Cendant's state law claims into impermissible contribution claims, barred by the PSLRA

contribution bar. *Id.* The court again disagreed, holding that the mere fact that "Cendant seeks

as an element of damages to recover amounts it has paid in settlement is not what defines its

claims; the basis for liability is what defines the nature of its claims." *Id.* at 10. The court

determined that it was a matter of general contract and tort law that, when a wrongdoer's conduct

has caused another to be cast in foreseeable liability to a third party, the liability is recoverable as

an element of damages. *Id.* Applying that principle, the court declined to strike Cendant's

prayer for damages:

Here, Cendant's claims are each grounded in separate theories which require proof of different elements than does a simple claim for contribution, which requires only proof that two or more parties became liable to the plaintiffs and one party paid more than its fair share of the damages to the plaintiff. This Court's own reasoning in its earlier opinion, which explained why the state law claims were not indemnity claims, applies equally to why those same claims are not contribution claims. There the Court discussed several different cases which recognized that even if the damages might overlap, that did not necessarily transform a separate, independent state law claim into a claim for indemnity, because there is a "distinction between recovery under principles of contribution or indemnity versus ordinary, direct tort liability."

*Id.*

In this Action, there is no reason for the Lead Derivative Plaintiff and Lead Derivative Counsel to agree to the imposition of this bar. It constitutes an unfair result for Doral and its shareholders. The Court should strike the offensive language and, because Lead Derivative Plaintiff was prepared to bar those claims, grant Dr. Fox's motion to remand his case back to the Court of First Instance of the Commonwealth of Puerto Rico.

## 2.    The Benefits to Doral of the Corporate Enhancements are Illusory and Unrelated to the Abuses Committed by the Derivative Defendants

Despite no monetary recovery for the Company, Lead Derivative Plaintiff still urges this Court to approve the Derivative Settlement, claiming to have negotiated certain corporate enhancements for the benefit of Doral. Because these benefits are illusory, this Court should not give much credence to the argument that these reforms will actually benefit Doral.

When evaluating a non-monetary settlement, Courts must determine that the benefit is "'something more than technical in its consequences and be one that accomplishes a result which corrects or prevents an abuse which would be prejudicial to the rights and interests of the corporation or affect the enjoyment or protection of an essential right to the stockholder's interest.'" *In re Texaco, Inc. S'holder Litig.,* 20 F. Supp. 2d 577, 592 (S.D.N.Y. 1998) (quoting

*Bosch v. Meeker Coop. Light & Power Assoc.*, 257 Minn. 362, 367 (1980)), *rev'd sub. nom. on other grounds*, *Kaplan v. Rand*, 192 F.3d 60 (2d Cir. 1999).

The corporate enhancements that constitute the entirety of the Derivative Settlement fail this test. Instead, the enhancements relate to areas of Doral's corporate governance that were not the cause of Doral's improprieties and were, presumably, already adequate. Doral's problems stemmed from accounting irregularities, improper financial controls, lack of qualified accounting professionals, and weak audit committee oversight. The enhancements in the Derivative Settlement relate to independent Board members, related party transactions, Board leadership, executive compensation, shareholder proposals, and poison-pill provisions. These reforms, while perhaps beneficial outside the context of this Action, should not be viewed favorably by the Court when evaluating the merits of the Derivative Settlement. The proposed enhancements should have been akin to those set forth above at pages 8-9, which are directed specifically at the Audit Committee's oversight of the Company's auditor, and address the almost unfathomable circumstance that two of the five members of the current Audit Committee were members of that Committee throughout the Relevant Period, and that PwC, which "audited" the grossly misstated financial statements continues to serve as Doral's auditor, notwithstanding the availability of competent alternative auditing firms.

Finally, as mentioned earlier, all of the corporate enhancements that comprise the totality of the Derivative Settlement may be modified or eliminated upon a majority vote by Doral's shareholders. (*See* Stipulation, Schedule 1 (agreed-upon corporate governance enhancements may be modified when, among other things, such modification "is first approved by Doral's shareholders by a majority of votes cast at a shareholders' meeting at which a quorum is present")). Because Doral will, in all likelihood, be controlled by one shareholder as a result of

the Refinancing Transaction, the corporate enhancements are completely illusory and of no real benefit to Doral or its current shareholders. For this form of non-monetary relief to have any meaningful benefit to the Company and its victimized shareholders, who after the Refinancing Transaction will be subject to the control of a shareholder who will own 90% of the Company, the enhancements Dr. Fox proposes should be adopted and required to remain in effect for at least five years.

**B.    The Settlement Negotiations Were Not Extensive or Well Informed**

Courts also must pay close attention to the negotiating process when evaluating any settlement proposal. "A court reviewing a proposed settlement must pay close attention to the negotiating process, to ensure that the settlement resulted from 'arms-length negotiations and that plaintiffs' counsel have possessed the experience and ability, and have engaged in the discovery, necessary to effective representation of the class's interests.'" *D'Amato,* 236 F.3d at 85 (quoting *Weinberger,* 698 F.2d at 74); *see also In re AOL Time Warner Shareholder Derivative Litig.,* 2006 WL 2572114 (S.D.N.Y. Sept. 6, 2006) (settlement was achieved only after extensive arm's-length negotiations, overseen by a court-appointed special master, and significant discovery, which bolstered the parties' assessment of the strengths and weaknesses of their positions and informed their negotiation strategies).

Here, Lead Derivative Counsel has done virtually nothing since filing its initial complaint twenty-six months ago. The Action has been ***voluntarily stayed*** since June 2006, and Lead Derivative Counsel has ***not*** filed an amended complaint or conducted any discovery. Moreover, based upon a reading of the settlement documents filed with this Court, Lead Derivative Counsel does not appear to have engaged in extensive settlement negotiations leading up to the Derivative Settlement, or even retained an expert or mediator in any attempt to achieve a meaningful recovery. Lead Derivative Counsel has done none of the things that one would expect of a

fiduciary who was fully engaged and interested in a beneficial outcome for the Company.  For this additional reason, the Derivative Settlement should not be approved.

Moreover, based upon the settlement documents filed with this Court, Lead Derivative Counsel has conducted virtually no analysis to determine even whether the Derivative Settlement is fair, reasonable or adequate.  The Stipulation makes clear that Lead Class Counsel, during settlement negotiations, reviewed extensive information regarding Doral's financial condition, engaged in a five-month long mediation, and hired regulatory and financial experts to assist them in negotiating a settlement (Stipulation ¶¶ H, I and J).  The Stipulation makes no such mention of Lead Derivative Counsel's efforts, other to say that he had "extensive negotiations" (without mentioning any details), and thereafter coordinated negotiations with Lead Plaintiff (Stipulation ¶ I).  It is clear by what the Stipulation does not say that Lead Derivative Counsel put very little effort into negotiating the Derivative Settlement, choosing instead to ride Lead Class Counsel's coattails in order to get a substantial fee.  As a result, and in view of Mr. Federman's conduct in connection with the derivative settlement in *Brocade*, Dr. Fox should be afforded limited discovery into the manner in which Lead Derivative Counsel negotiated the Derivative Settlement and determined that it was in Doral's best interests to accept it.

*Lewis v. Hirsch,* 1994 WL 263551 (Del. Ch. 1994) is illustrative.  In that case, the amended complaint alleged that, for over five years, the individual defendants received grossly excessive compensation in the form of cash, bonus payments, and stock options that were granted pursuant to U.S. Surgical's stock option plans.  The amended complaint also alleged that several of the individual defendants breached the fiduciary duties they owed to the corporation by using U.S. Surgical's material non-public information when deciding to sell large quantities of their U.S. Surgical stock, thereby making huge profits for themselves before the value of the

stock plummeted. The court in *Lewis* refused to approve the settlement because of counsel's failure to investigate thoroughly the insider-trading allegations. The Court stated that

> upon the record before it at this time, it is unable to adequately evaluate the value of the insider trading claims as compared to the value of the somewhat speculative benefits conferred by the settlement because [the plaintiff] has so far failed to adequately investigate those claims. The Court, therefore, is unable to presently conclude, in the exercise of its business judgment, and in its discretion, that the settlement is reasonable and fair in light of all of the factual and legal circumstances.

*Id.* at *7.

Here, there was no investigation of the strengths or weaknesses of the derivative claims, no attempts to conduct discovery or prosecute this Action, and no attempts to impose a constructive trust on any of the ill-gotten gains received by the Individual Defendants. Moreover, there appears to have been very little effort expended in negotiating the Derivative Settlement.

This Court should not approve any settlement where, such as here, there was no effort made to prosecute the Action, nor any attempt to negotiate a settlement in a well-informed, dedicated and skillful manner.

**C.    Lead Derivative Counsel is Not Entitled to Attorney's Fees Because the Benefits to Doral From the Settlement Are Insubstantial**

Lead Derivative Counsel has done next to nothing here, either to prosecute the Action or to achieve the Derivative Settlement. Because the Derivative Settlement confers no real benefits on Doral, even if this Court were to approve the Derivative Settlement in it current form, which it should not, Doral should not be forced to pay Lead Derivative Counsel an award of attorney's fees.

In *Kaplan v. Rand,* 192 F.3d 60, 62 (2d Cir. 1999), a derivative action related to Texaco's discriminatory employment practices, the Second Circuit held that, upon settlement, the plaintiffs

were not entitled to counsel fees under New York law because the settlement obtained no substantial benefits to the corporation.  In the consolidated amended complaint filed in that action, the plaintiffs sought various forms of relief against the defendants for breach of fiduciary duties and contractual obligations.  The district court approved the settlement, but found that the non-pecuniary settlement terms were "essentially institutional," and further observed that "it is obvious that the settlement, which brings no monetary benefit to the company, is far less than was envisioned."  *Id.*  Although the district court nonetheless awarded attorneys' fees, the Second Circuit reversed that award, holding that the "plaintiffs in a derivative action are entitled to counsel fees upon a settlement of the action only when the non-monetary, therapeutic benefits obtained are substantial in nature."  The Court went on to say that "[f]ar from providing a remedy for clearly identified past misconduct, the settlement in this case strives to provide therapeutic 'benefits' that can only be characterized as illusory."  *Id.* at 71; *see also Zucker v. Westinghouse Elec. Corp.* 265 F.3d 171, 176 (3rd Cir. 2001) ("[a] plaintiff should not receive a fee in derivative litigation unless the corporation, by judgment or settlement, receives some of the benefit sought in the litigation or obtains relief on a significant claim in the litigation.").

Here, by negotiating only modest corporate reforms that do not address the underlying problems that caused Doral's restatement (and it remains unclear whether Lead Derivative Counsel is entitled to claim any responsibility for those reforms), and that can be rescinded or modified at will after completion of the Refinancing Transaction, Lead Derivative Counsel should not receive an attorney's fee.  This is particularly so in light of the minimal time and effort expended by Lead Derivative Counsel and the fact that Doral itself would be required to pay the $1,000,000 requested fee without having received one penny of monetary recovery.

21

## CONCLUSION

For the foregoing reasons, Dr. Fox respectfully requests that this Court not approve the Derivative Settlement in its current form. The Court should (i) require a sufficient showing that the Individual Defendants are not financially capable of meaningfully contributing to the Derivative Settlement; (ii) require Doral to adopt reasonable corporate governance enhancements that are directed at the failures that led to the fraud; and (iii) modify the bar order provision of the proposed judgment so that Dr. Fox's claims against PwC are not barred; and (iv) remand Dr. Fox's action back to the Commonwealth of Puerto Rico, Court of First Instance. Dr. Fox also requests that the Court not award Lead Derivative Counsel any attorney's fees without a demonstration of the benefits Lead Derivative Counsel actually provided.

       s/_____
Richard A. Speirs (RS-8872)
Kevin M. McGee
**ZWERLING, SCHACHTER**
  **& ZWERLING, LLP**
41 Madison Avenue
New York, NY 10010
Tel.: (212) 223-3900
Fax: (212) 371-5969

     -  and –
     -
Gerald H. Silk (GS-4565)
Jeffrey N. Leibell (JL-1356)
**BERNSTEIN LITOWITZ BERGER &**
  **GROSSMANN LLP**
1285 Avenue of the Americas, Suite
New York, NY 10019
Tel.: (212) 554-1400
Fax: (212) 554-1444

*Counsel for Robert Fox*